**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KENNETH A. DOCKINS,
Plaintiff-Appellant,

v.                                                                                  No. 98-1285

BENCHMARK COMMUNICATIONS,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CA-97-554-6-20-AK)

Argued: January 26, 1999

Decided: March 29, 1999

Before WILKINSON, Chief Judge, and WILKINS and
KING, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
majority opinion, in which Judge Wilkins joined. Judge King wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Benjamin Allen Dunn, II, CROMER & MABRY, Colum-
bia, South Carolina, for Appellant. Brent Overton Edgar Clinkscale,
HAYNSWORTH, MARION, MCKAY & GUERARD, Greenville,
South Carolina, for Appellee. **ON BRIEF:** James Lewis Mann Cro-
mer, CROMER & MABRY, Columbia, South Carolina, for Appel-

lant. Hamlet Sam Mabry, III, HAYNSWORTH, MARION, MCKAY & GUERARD, Greenville, South Carolina, for Appellee.

_____

## OPINION

WILKINSON, Chief Judge:

Kenneth A. Dockins brought suit against his former employer, Benchmark Communications, alleging that Benchmark fired him because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq . The district court, holding that Dockins failed to raise a triable issue of fact as to whether age was the real reason for his termination, granted summary judgment to Benchmark. Because it is clear that Benchmark discharged Dockins because of poor performance rather than his age, we affirm.

I.

From 1975 until his discharge in 1996, Dockins worked as an account executive for WESC, a radio station in Greenville, South Carolina. Dockins sold air time to advertisers in the station's listening area. WESC paid Dockins on a straight commission basis augmented by occasional bonuses. Dockins was supervised by Charles Wayne Sumner who, as the station's senior account executive, also sold advertising time.

In March 1995, Benchmark Communications purchased WESC. Benchmark hired Mike LoConte to oversee the seven to eight sales representatives of WESC as well as the representatives of its sister station, WTPT.

LoConte, whose remuneration depended in part on the revenues generated by those under his command, attempted to improve advertising sales. Once a month he met with each representative to establish sales goals for the forthcoming month and to analyze the previous month's sales. In one of LoConte's first meetings with Dockins in August, LoConte informed him that his performance was substandard

2

and requested that he submit daily call sheets to focus his sales activities.

Despite LoConte's warning to Dockins about his performance, Dockins' output continued to lag behind that of his colleagues. In the third quarter of 1995 Dockins sold less than any other salesman who worked for WESC for the full quarter -- generating $20,000 less in sales than the representative selling the next lowest amount. In the fourth quarter, Dockins was second-to-last in sales revenue generated. Most notably, Dockins failed to cultivate new accounts. His new account sales for the third quarter totaled only $2,490, placing him roughly $6,000 behind the next lowest full-time sales representative. In the fourth quarter, Dockins' new account sales dipped to just $900.

In response to Dockins' scant output, LoConte called a meeting with Sumner and Dockins on January 15, 1996. LoConte informed Dockins that he was placing him on a thirty-day probationary period, during which LoConte expected his sales numbers to improve. When they did not, LoConte terminated Dockins' employment. Dockins was sixty years old at the time.

Alleging that Benchmark fired him because of his age rather than for any legitimate reason, Dockins brought suit in the United States District Court for the District of South Carolina. The district court granted summary judgment to Benchmark.

II.

Dockins attempts to prove his claim of discrimination by relying on the extended burden-shifting scheme first enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). At this stage in the litigation, however, the ultimate question is whether Dockins can demonstrate that Benchmark discharged him because of his age. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). We agree with the district court that Benchmark discharged Dockins because of his poor performance, and that this case is clearly one about business realities rather than age animus.

3

A.

Benchmark claims that it fired Dockins due to his poor performance rather than because of his age. Benchmark offers substantial evidence that Dockins' sales output during the second two quarters of 1995 pegged him as WESC's least effective sales representative. During the third quarter, Dockins posted a total of $60,229 in sales, fully $20,000 less than the next lowest performing full-time representative. During the fourth quarter, Dockins sold $74,776 worth of air time, a sum which landed him second from the bottom.

Just as importantly, Dockins' sales from new accounts were below those of his fellow sales representatives. He generated only $2,490 in July and none in August or September, making him the lowest producing full-time salesman by nearly $6,000. Similarly, he created no sales from new accounts in October and November, and only $900 worth in December.

Notably, Sumner, who is close in age and experience to Dockins, consistently turned in sales figures that far outstripped Dockins'. For instance, Sumner sold $207,515 in air time for the third quarter of 1995 as compared with Dockins' $60,229. And in the fourth quarter Sumner sold $210,313 worth of advertising while Dockins' sold only $74,776. Finally, Sumner's new business sales for the third quarter alone were well over Dockins' for the third and fourth quarters combined.

Dockins does not dispute the fact that his numbers place him not at the top, not even in the middle, but at the absolute bottom of the list. Instead, he offers excuses. Dockins alleges that Benchmark took a series of actions to lower his sales figures during the last half of 1995. But even if Benchmark attempted to decrease Dockins' sales, that fact is irrelevant unless Dockins can show Benchmark did so because of age bias. This, he cannot do.

First, Dockins alleges that Benchmark failed to include in his sales figures the "trade business" -- the trading of air time for goods and services rather than money -- in which he engaged during the last half of the year. Second, Dockins claims that Benchmark transferred one of his accounts to another WESC sales representative. Third,

4

Dockins claims that LoConte refused to provide some of Dockins' accounts with bonus commercials, forcing them to discontinue their advertising with WESC.

Benchmark presents unrefuted evidence, however, that in each instance it acted pursuant to neutral corporate policies which it applies equally to each of its representatives regardless of age.[1] With regard to Dockins' trade business, it is Benchmark's standard practice to exclude those figures from a representative's sales. Similarly, Benchmark followed its traditional rule of assigning accounts by company rather than brand name when it transferred Dockins' account. Finally, Benchmark introduces uncontested evidence that providing bonus commercials to Dockins' other accounts would have made them unprofitable.

Dockins makes two additional accusations that Benchmark hampered his performance, but he fails to provide any evidentiary support beyond mere supposition. In no event does he tie his allegations to age bias on the part of Benchmark.

Initially, he claims that LoConte was rude to a representative from an advertising agency to which Dockins had sold advertising slots, causing the agency to purchase air time elsewhere. Even assuming that LoConte was rude to the advertising agency's representative, Dockins provides no evidence that age animus was the reason. In addition, Dockins proffers nothing other than his belief that it was LoConte's behavior that ultimately caused the agency to look elsewhere.

Dockins further claims that LoConte diverted "call in business" -- business in which potential advertisers call the station unsolicited -- away from him. Again, conspicuously absent from Dockins' claim is any evidence that age motivated LoConte. Moreover, Dockins himself admits that he has no knowledge of any instance in which call in business was channeled away from him. Indeed, he introduces only the testimony of another sales representative, Allan Jenkins, that call in

_____

[1] The lone exception to Benchmark's neutral policy explanation is an account that changed ownership and whose new owners decided to pursue other advertising outlets.

5

business "probably" was diverted. Such unspecific and speculative opinions are simply insufficient to raise a triable issue of fact as to Dockins' performance. See, e.g., EEOC v. Clay Printing Co., 955 F.2d 936, 945-46 (4th Cir. 1992).

Finally, excuses aside, Dockins attempts to cast doubt on Benchmark's performance rationale by referencing the fact that Benchmark awarded him three bonuses during the last half of 1995. But with regard to two of the bonuses, Dockins gives us no reason to believe they say anything about his individual performance. Benchmark awards bonuses for any number of reasons, for instance, as rewards for being part of a team that performs well. Dockins does explain his third bonus; Benchmark rewarded him for reaching ninety percent of his sales goal mid-month. Dockins' partial performance for one month, however, says nothing about his overall performance for the entire second half of 1995.[2]

In sum, Dockins' poor sales figures go virtually unrebutted. Dockins' output lagged behind that of WESC's other representatives for the entire second half of 1995. It lagged both in total sales and in new business. LoConte warned Dockins and attempted to refocus his efforts by requiring daily call sheets. Still, Dockins' sales were spare. Finally, at the end of a thirty-day probationary period Benchmark terminated his employment. In the face of this evidence, Dockins presents nothing more than accusations that are either unsupported by the record or refuted by neutral policies. Dockins simply fails to indicate that any of Benchmark's actions demonstrate discrimination on account of age.

_____

[2] Dockins also trumpets the fact that Benchmark placed him on its company-wide All-Star Sales Team for 1995. The team included those representatives who sold $300,000 or more in air time for the year. Dockins fails to dispute, however, the fact that with the exception of one representative who had been with WESC for only two months every WESC salesman received a spot on the team. Receipt of such an award simply says nothing about Dockins' relative performance.

6

B.

Unable to demonstrate that any of the aforementioned actions were motivated by his age, Dockins alleges that LoConte and Sumner made comments revealing age bias. First, he claims that LoConte made comments referencing Dockins' age and health. For example, Dockins claims that when he and LoConte discussed Dockins' probation, LoConte said, "With your health and your age, you need to pick up the slack in your sales and I'm going to put you on 30-day probation." Dockins contends that LoConte made similar statements on other occasions such as when LoConte discharged him. Dockins, however, produces nothing other than his own affidavit to support his allegations that LoConte made inappropriate comments about his age. We have long held that "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons" for a discharge. Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989).

The only version of LoConte's statements for which Dockins presents any outside evidence -- here, the corroborating testimony of LoConte himself -- is one in which LoConte mentioned Dockins' health. As an initial matter, it is not surprising that LoConte mentioned Dockins' health since Dockins had on several occasions approached LoConte to ask for time off due to illness. Moreover, even if LoConte discussed Dockins' health, that fact in no way implies he was discriminating against Dockins because of his age. Health problems do increase with age. Consequently,"[r]ather than indicating a discriminatory purpose, . . . such statements seem only truisms." Smith v. Flax, 618 F.2d 1062, 1066 (4th Cir. 1980). Stating a fact of life does not make one an age bigot.

Second, Dockins presents the testimony of James Rice, another sales representative at WESC, that Sumner once referred to Dockins as a "dinosaur." Dockins fails, however, to connect Sumner's comment to any decision regarding his employment. See Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994); Clay Printing Co., 955 F.2d at 942. Indeed, it was LoConte, not Sumner, who made the decision to place Dockins on probation and who recommended his ultimate termination. Moreover, Rice himself testified that he had no reason to believe the comment related in any way to

7

Dockins' age. Finally, as noted, Sumner is roughly the same age as Dockins.

In any case, statements about age, unlike statements about race or gender, do not rest on a we/they dichotomy and therefore do not create the same inference of animus. "[B]arring unfortunate events, everyone will enter the protected age group at some point in their lives." Birkbeck, 30 F.3d at 512. Thus, every individual speaks with the knowledge that there with the grace of God go I.

Moreover, Benchmark produces significant evidence that it provides an environment that is receptive to older workers. Far from purging its older employees, Benchmark routinely employs and gives responsibility to workers over the age of forty. See Clay Printing Co., 955 F.2d at 941. Indeed, during the period of Dockins' employment all but one of the sales representatives were in the protected age group. Sumner, WESC's most prodigious salesman, was himself nearly sixty years old when Dockins was fired. And the station's chief engineer was close to sixty-five. Yet of all of these older employees, only Dockins was let go. The character of Benchmark's workforce, both before and after Dockins' termination, "suggests anything but a youth movement at [Benchmark]." Id.

III.

At base, it is clear that Benchmark's decision rested wholly on the necessities of the business world. It is not that we are without sympathy for Dockins' situation. We understand the fact that bottom line business realities produce decisions that are difficult for the individuals affected by them. But the lifeblood of any business is its ability to sell its product. If salesmen underperform, a business cannot survive. And if a business does not survive, all of its employees, including its senior ones, will be out of work. This is why the ADEA does not "require an employer to adopt a life of economic altruism and thereby immunize protected class members from discharge or demotion despite their poor performance." Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1287 (4th Cir. 1985). The ADEA prevents employers from acting on the basis of age-- not performance.

Here Dockins' sales numbers dipped precipitously during the latter half of 1995. Despite repeated warnings that he should improve those

8

numbers and suggestions about how he might do so, Dockins' output remained stagnant. Dockins does not establish a triable issue of fact that Benchmark discharged him for any reason other than his failure to perform. Indeed, he gives no reason why Benchmark would want to discharge any employee, young or old, who was earning a profit for the station.

The judgment of the district court is

AFFIRMED.

KING, Circuit Judge, dissenting:

Kenneth Dockins claims to have been discharged on account of his age and, on the record before us, he can prove it. Tellingly, the Local Sales Manager at WESC referred to Mr. Dockins as a"dinosaur." In addition, each time LoConte -- the decisionmaker with respect to Mr. Dockins's employment status -- took adverse employment actions against Mr. Dockins, he made disparaging comments about Mr. Dockins's age. In analyzing whether Mr. Dockins was, as Benchmark asserts, nothing more than a poorly performing salesperson who was properly discharged in February 1996, a jury can take into account, for example, the fact that Benchmark named Mr. Dockins to its All-Star Sales Team in January 1996 and that it also awarded Dockins at least two performance-based bonuses in the last half of 1995.

Given these and other facts in the record, I am compelled to dissent. In my view, the majority has failed to properly apply the analytical framework enunciated by this court in Vaughan v. The Metrahealth Cos., Inc., 145 F.3d 197 (4th Cir. 1998), and has ignored the legal mandate that, when reviewing an award of summary judgment, this court must view the evidence in the light most favorable to the nonmoving party, Burns v. AAF-McQuay, Inc., 96 F.3d 728, 730 (4th Cir. 1996), cert. denied, 520 U.S. 1116 (1997). As a result, it has incorrectly determined that Mr. Dockins has not raised a jury question on his ADEA claim.

In order to prevail on his ADEA claim, Dockins need only satisfy the two-pronged inquiry at the final stage of the McDonnell Douglas

9

framework: he must present sufficient evidence that the employer's proffered nondiscriminatory reason is false and that discrimination is the "real reason" for the discharge. See Vaughan, 145 F.3d at 201-02; Gillins v. Berkeley Elec. Coop., Inc., 148 F.3d 413, 416-17 (4th Cir. 1998) (noting our adoption of the pretext-plus standard in Vaughan).

The district court correctly concluded, contrary to the majority here, that Dockins had presented sufficient evidence to create a genuine issue of material fact about the legitimacy of Benchmark's proffered reason for the discharge -- poor performance. Mr. Dockins claims, in substance, that his asserted poor performance was the fault of Benchmark, and thereby puts the legitimacy of the proffered reason for his discharge at issue. He specifically points to other factors that caused his low sales figures for the third and fourth quarters of 1995.[1]

As the district court recognized, during the two quarters at issue Mr. Dockins had an unusually high amount of "trade business" that was not reflected in his cash sales figures.[2] Call-in customers seeking

_____

[1] In his Order granting summary judgment entered on February 13, 1998, Judge Herlong found as follows:

> Dockins contends that he generated an unusually high amount of "trade business" that watered down his cash sales figures. Furthermore, Dockins alleges that several actions taken by Benchmark worked to curb his sales figures. He states that he did not receive sufficient "call-in" business during the period in question. Finally, Dockins alleges that Benchmark failed to protect the accounts he already managed by allowing other account executives to undercut certain clients. These allegations unequivocally refute the facts supporting Benchmark's stated reason. Viewing these in the light most favorable to Dockins, the court finds that a reasonable trier of fact could decide that Benchmark's proffered reason is not legitimate.

[2] "Trade business" refers to an exchange of merchandise (or services) for radio time. Mr. Dockins was handling about $20,000 of trade business during the relevant period. He did not receive credit or commissions for his trade business, though there is evidence that other account executives, such as Wayne Sumner, were allowed to be paid 10 percent commissions on trade. See ante, at 4-5.

Although there is conflicting testimonial evidence on this point, the issue of credibility of witnesses is not for this court. See United States

10

to buy air time were diverted from Mr. Dockins and channeled to younger sales representatives. Indeed, account executive Allan Jenkins acknowledged under oath that some call-in business that should have gone to Mr. Dockins was probably either kept by Wayne Sumner or given to another salesperson.**3** For these reasons, the district court correctly concluded that, viewing the evidence in the light most favorable to Mr. Dockins, a reasonable trier of fact could decide that Benchmark's articulated reason for its termination of Mr. Dockins is a pretext.**4**

Next, in order to survive summary judgment, Mr. Dockins must satisfy the second prong of the pretext-plus inquiry. He is required to adduce "some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." Vaughan, 145 F.3d at 202. Dockins must "present affirmative evidence of age-based animus." Burns, 96 F.3d at 732. Mr. Dockins clearly meets this burden with, inter alia, his testimony regarding the comments relating to his age and health made to him by LoConte, the decisionmaker.

First, in August 1995, when LoConte and Dockins were walking to the General Manager's office for the meeting in which Dockins was asked to become an independent contractor, LoConte said to Dockins: "This will relieve you at your age of a lot of stress and problems from what I'm going to put on everybody else." After the meeting, according to Dockins, LoConte

_____

v. Burgos, 94 F.3d 849, 868 (4th Cir. 1996) (en banc) ("Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder, not the reviewing court.") (citation omitted), cert. denied, 519 U.S. 1151 (1997).

**3** Sumner not only won the top sales award for WESC for 1995, but also was Benchmark's company-wide sales leader for 1995. Sumner is the Local Sales Manager who referred to Mr. Dockins as a dinosaur.

**4** Contrary to the majority's assertions, ante, at 4, it is not necessary for Mr. Dockins to demonstrate that each of Benchmark's actions was motivated by age bias. At the pretext stage of the pretext-plus inquiry, as the district court correctly found, Mr. Dockins need only specifically refute the facts that support Benchmark's proffered reason for his termination. See DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)(citation omitted).

11

> reiterated again that at my age and health -- and I don't
> know what he's talking about, health, other than the fact that
> I had had diverticulosis in May -- that I didn't need to be
> under the stress that he was going [to] put on everybody and
> to think long and hard about it.

Dockins was the only employee who was asked to become an independent contractor; he declined, because it would have left him without, among other things, retirement benefits and life and health insurance.

LoConte's next age-related comment was delivered in mid-January 1996, when he put Mr. Dockins on thirty days' probation. Of significance, this incident occurred only two weeks after Mr. Dockins was named to Benchmark's All Star Sales Team for having sold over $300,000 worth of advertising in 1995.[5] Yet LoConte placed Mr. Dockins on probation "due to poor performance for WESC sales." When LoConte told Mr. Dockins about the probation, he said: "With your health and your age, you need to pick up the slack in your sales and I'm going to put you on 30-day probation."

Finally, on February 19, 1996, LoConte terminated Dockins from employment with Benchmark. Sumner, who had called Mr. Dockins a dinosaur, was present at the termination meeting. [6] According to Mr. Dockins, LoConte advised him on that occasion that "with my health

---

[5] Although General Manager Allen Power testified that $300,000 was set as an easy mark so that sales representatives from Benchmark's smaller stations could be included on the All-Star Team, ante, at 6 n.2, none of the representatives from WESC's sister station, WFNQ (now identified as WTPT) made the 1995 All-Star Team. Moreover, there are at least two other stations appearing in other award categories that are not represented on the All-Star Team. Certainly a reasonable juror could find that Benchmark's All-Star Team was an award of significance, and that Power's explanation was unpersuasive.

[6] That Sumner (or any of the other account executives) was roughly the same age as Mr. Dockins does not insulate Benchmark from liability here. Ante, at 8. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996).

12

and my age, that it was best that I do something else and for us to part ways."**7**

These direct and unambiguous age-related comments were made by the decisionmaker and were delivered contemporaneous with adverse employment actions. The timing and connection of these statements negates any possible assertion that they might be considered nonprobative, isolated remarks. See O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 549 (4th Cir. 1995)(there must be some "`nexus . . . between the alleged discriminatory statements and any of the employment decisions made by the [employer]'") (quoting EEOC v. Clay Printing, 955 F.2d 936, 942 (4th Cir. 1992)), rev'd on other grounds, 517 U.S. 308 (1996).

Furthermore, contrary to the majority's assertions, ante, at 7-8, Mr. Dockins's testimony is sufficient -- standing alone -- to survive summary judgment.**8** Gray v. Spillman, 925 F.2d 90, 95 (4th Cir.

_____

**7** The majority too readily dismisses the health-related comments as irrelevant. These comments were neither remote in time from, nor unconnected to, the adverse employment decisions; nor were they simply truisms about age, as the majority asserts. The comments were not general statements about health problems increasing with age, cf. Birnbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994); Smith v. Flax, 618 F.2d 1062, 1066 (4th Cir. 1980), rather they explicitly concerned Mr. Dockins's health and age.

The import of the health-related statements is just the sort of question that a jury, and not this court, should decide. A reasonable fact-finder could find, on the basis of evidence in the record, that there was little foundation for the concern about Mr. Dockins's health, and that the health-related comments, made in conjunction with age-related statements and contemporaneously with adverse employment actions being taken against Mr. Dockins, were probative of age animus.

**8 Williams v. Cerberonics, Inc.** , 871 F.2d 452 (4th Cir. 1989), cited by the majority, ante, at 7, is inapposite. There, we reviewed the district court's judgment following a bench trial that Cerberonics's termination of Ms. Williams did not violate Title VII. The issue for our review was whether the trial court clearly erred in finding that Ms. Williams was fired for legitimate reasons. Id. at 456. We concluded that the district court did not err in discounting Williams's few assertions of discrimina-

13

1991)(concluding that plaintiff's own deposition testimony created a genuine issue of material fact regarding his § 1983 claim and that summary judgment for the defendants was improper). The testimony of Mr. Dockins "is significantly probative; if believed by the jury, the testimony is dispositive. Whether or not [Dockins's] testimony should be believed is a credibility determination that is not for us to make." Id.

Put simply, this is a case for jury determination, and any lawyer would be pleased with this much evidence from which to frame a jury argument on Mr. Dockins's behalf. Mr. Dockins has presented more than sufficient evidence "from which a reasonable factfinder could conclude that [Benchmark] engaged in intentional age discrimination." Halperin v. Abacus Tech. Corp., 128 F.3d 191, 202 (4th Cir. 1997) (citation omitted).

Because, on this record, a genuine issue of material fact clearly exists, Mr. Dockins's claim should be heard by a jury -- a right that is guaranteed by the ADEA. 29 U.S.C. § 626(c)(2); Lorillard v. Pons, 434 U.S. 575 (1978). Consequently, I would reverse and remand for a jury determination of whether the termination of Mr. Dockins violated the ADEA. I must respectfully dissent.

_____

tion, which had all been "conclusively rebutted" at trial, in the face of "overwhelming" evidence supporting the legitimacy of the reasons proffered for her termination. Id. at 456-57. This is not the case here. The question before us is simply whether or not Mr. Dockins has raised a genuine issue of material fact to get to a jury. This he can do with deposition testimony alone. Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991).

14