**Ralph D. RANSOM, Plaintiff,**

v.

**Richard DANZIG, Secretary, Department of Navy, Defendant.**

**Civil Action No. 98–890–A.**

United States District Court, E.D. Virginia, Alexandria Division.

April 13, 1999.

Ralph Dementri Ransom, pro se.

Leslie Bonner McClendon, U.S. Attorney's Office, Alexandria, VA, for defendants.

## MEMORANDUM OPINION

HILTON, Chief Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment.

This action was brought by Plaintiff ("Ransom"), a GS–5 Support Services Clerk, against the Secretary of the Navy[1] with respect to actions taken by the commander of the U.S. Naval Activities United Kingdom ("COMNAVACTUK"), located in London, England. Ransom, an American citizen and resident of London, England brought suit in connection with his 1992 non-selection for the position of Security Specialist, GS–9, with the Naval Computer and Telecommunications Station ("NCTS"), a part of COMNAVACTUK.

Ransom brings suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* In his Complaint, Ransom alleges that he was not selected for the position due to his race (African American), and due to his prior filing of EEO Complaints against the government. Following an investigation by the agency which resulted in a finding of no discrimination, Ransom appealed his non-selection to the Equal Employment Opportunity Commission ("EEOC"). The EEOC held a hearing in London and upheld the agency's decision. Ransom timely filed suit in this Court on June 22, 1998.

On August 16, 1991 Lieutenant Commander Robin Babb submitted a request for personnel action seeking recruitment of

1. Ransom originally sued then-Navy Secretary John Dalton. Subsequent to Ransom's filing suit, Richard Danzig became the Secretary of the Navy. Therefore, the Court has substituted the present Secretary as the proper Defendant in this matter.

a Security Specialist GS–9. The Security Specialist would be responsible for "controlling, auditing, accounting for, [and] distributing, all the cryptographic key codes, actual cryptographic hardware that ensures the messaging services that we provide, or the voice services that we provide, are in fact secure, cannot be broken into." In other words, the person they were looking to hire would be in charge of managing the command's Communications Security ("COMSEC") material. This person would be the principal advisor to the commanding officer concerning the physical security and handling of COMSEC material.

Babb's request was passed along to the personnel classification unit where it was reviewed for accuracy. Upon review and approval, a job announcement was prepared. This job announcement contained an opening and closing date for applying, as well as a statement of duties and rating and ranking factors. Chuck Fairchild, Staffing and Classifications Specialist, Naval Undersea Warfare Center, Keyport, Washington, was the civilian personnel advisor for the selection. Fairchild assisted in the development of the rating and ranking factors. Babb informed Fairchild of the factors to be considered when identifying the elements.

Once the factors were identified, a crediting plan was developed. The crediting plan listed the factors and point levels to be given to each factor. Fairchild served in an advisory role for developing the crediting plan by making sure there was a distinction between the points given to each factor. The position was then announced worldwide throughout the Department of the Navy on a "Merit Promotion" basis.

The significance of listing the position on a Merit Promotion basis is that, under this basis, in order for an applicant to even be considered he or she must hold or have previously held what is known as a "career or career conditional" appointment. If one has, or had, a "career or career conditional" appointment, they are referred to as having "status."

After the Merit Promotion announcement, many persons with and without status applied for the Security Specialist position. However, the Navy was not interested in any of the status applicants that applied because they did not possess Communication Material System ("CMS") Custodian experience. While the Navy was interested in some of the non-status applicants who applied, the Merit Promotion announcement precluded their hire. Ransom, who was then employed as a civilian Security Assistant, GS–06, with the Commander in Chief of the U.S. Naval Forces Europe ("CINCUSNAVEUR"), was a non-status applicant for the position.

Because of its inability to hire a Security Specialist pursuant to the Merit Promotion announcement, the Navy was advised to re-advertise the position using a direct hire announcement. The Navy used what is known as a "Bulletin 40" direct hire announcement, intended to gain access to a broader pool of applicants. Use of a Bulletin 40 allows for the consideration of non-status personnel for the position advertised.

On November 11, 1991, the Security Specialist position was re-announced under "Bulletin 40 Vacancy Announcement Number 91–082" with a closing date of November 25, 1991. Ransom and other applicants who had originally applied for the position through the Merit Promotion announcement were not required to re-apply for the position; their applications were automatically reconsidered for the position.

Fairchild reviewed all of the approximately 33 applications for basic qualifications. Babb then identified "Subject Matter Experts" to review the applications, pursuant to Office of Personnel Management ("OPM") regulations. Babb had been told by Fairchild that the Subject Matter Experts had to have knowledge of the position and had to have held a rank at least equal to the position that they were going to evaluate. Fairchild then orga-

nized a Subject Matter Expert panel consisting of three members who had all held the position at issue.

The three Subject Matter Expert panel members rated and ranked the applicants and gave them summary ratings. Each of the panel members calculated their own individual ratings on the applications. The panel members then prepared a composite summary rating, which ultimately was the final rating. Fairchild thereafter reviewed the composite ratings and compare the ratings to the crediting plan for accuracy.

The panel's ratings were reviewed and approved by an OPM Personnel Staffing Assistant in Washington, D.C. named Bertha Johnson (African American female). The race of the applicants was not on the data Johnson received from the Navy, hence race played no role in her review of the documents. Johnson placed the top five eligible candidates, including Ransom, on a list called the "Certificate of Eligibles," in numerical order beginning with the highest score. Ransom ranked fourth out of the five individuals on the Certificate of Eligibles.

On January 3, 1992 the Certificate of Eligibles was issued to the Navy by OPM. Once the Certificate of Eligibles is issued, the selection process proceeds according to an OPM regulation called the "Rule of Three," defined in Chapter 332 of the Federal Personnel manual. Under the Rule of Three, the selecting official must make a selection from the three highest scoring individuals who are available for appointment. In this case all of the three highest scoring individuals were available and eligible for appointment.

Because the three highest ranking applicants were all available and eligible for appointment, the Subject Matter Experts had to recommend selection of one of the top three on the list. They recommended the selection of Michael Cox (white male) for the Security Specialist position. Cox had been ranked second on the list, but was the cheapest move of the three in that he was already in London while the top

scoring candidate was in Norfolk, Virginia. Commander (now Captain) Joseph Keane (white male), Commanding Officer of the Naval Communications Unit, was the selecting official for the position. He followed the recommendation of the Subject Matter Experts and selected Cox for the position.

In early February, 1992, Ransom was notified that he had not been selected for the position. On February 11, 1992 Ransom wrote to the Director of Consolidated Civilian Personnel complaining of his non-selection. Fairchild responded to Ransom's letter by informing him that his application had been rated and ranked and then forwarded to OPM, which reviewed the application and issued its Certificate of Eligibles.

Ransom timely initiated contact with an EEO counselor on March 3, 1992, and timely filed his Formal Administrative EEO Complaint on April 23, 1992. Ransom elected to petition the EEOC for a hearing before an EEOC Administrative Judge with a final decision from the Department of the Navy. The hearing was held on August 16, 1993, and the EEOC Administrative Judge issued her decision finding no discrimination on February 8, 1995. The final agency decision adopting the EEOC decision is March 24, 1995. Ransom appealed the final agency decision to the EEOC Office of Federal Operations ("OFO"), which affirmed the decision on October 31, 1996. Plaintiff sought reconsideration by the EEOC of the OFO decision, but this too was denied. Ransom then filed this Complaint.

It is Ransom's allegation that the Navy failed to promote him due to his race, and in retaliation for his previous EEO activity.[2] It is Ransom's belief that Barry Baxter (who preceded Cox) took Cox to the U.S. Naval Communications Unit to meet with Lieutenant Commander Babb, and it was at this time that Cox was informally hired. However, because Cox could not accept employment with the Navy immedi-

---

**2.** Ransom has filed a total of seven EEO complaints against the government.

ately due to a 180–day waiting period upon his leaving the United States Air Force, Ransom contends that Cox' application was held and the vacancy was re-announced to coincide with the expiration of the 180–day requirement.

Ransom argues that he was the far more qualified candidate for the position, and the only way to explain his non-selection is discrimination or retaliation. Ransom's qualifications include: 1) the completion of the required Communications Security Material System course; 2) the completion of the Communications Security Material System Custodian course; 3) his last yearly performance appraisal he received as a Security Specialist with the NCTS rating him as "outstanding"; 4) his then-current adjudication to process and handle Top Secret information; 5) his many years of work in the Department of Navy; and 6) superior qualifications to Cox in the area of Naval security.

This was contrasted with Cox, who had never before worked for the Navy. While Cox had been a communications supervisor in the Air Force, Air Force security systems are tailored for air bases and not ships afloat. Therefore, Cox could not have better experience than Ransom. To prove this point Ransom traveled to Lakenheath, England and had an Air Force COMSEC manager (the position Cox had previously held) attempt to answer a questionnaire Ransom had prepared pertaining to Naval security. The Air Force manager faired very poorly in answering the questionnaire. Ransom concludes from this that he must have better experience than someone who had been handling Air Force COMSEC for years.

The Navy counters that they hired Cox because he had the most recent experience in a CMS account and had been doing the job until he retired less than one year prior to his selection (Cox worked in COMSEC up until the point he retired from the Air Force, and had ten years experience as a COMSEC Custodian). Ransom, on the other hand, held the position of COMSEC Assistant Custodian from January, 1982 until May, 1987. Hence, Cox had greater responsibility in his role (Custodian vs. Assistant Custodian), and he had held the COMSEC position more recently. Further, the Navy asserts that while Ransom had managed Top Secret NATO documents, they were not CMS documents.

The Navy asserts that the distinction between Custodian (Cox) and Assistant Custodian (Ransom) is critical, as the Custodian is ultimately responsible to the commanding officer for the CMS account. CMS is critical to national security and the Custodian not only is responsible to the commanding officer for maintaining the account but also in interpreting the policies from higher headquarters.

Further, the Navy explains that the National Security Agency ("NSA") governs COMSEC material. This means that while the different military services may issue their own publications on security procedures, the systems of each service must be consistent with that of NSA. Because the Army and the Air Force do not differ from the Navy on basic COMSEC features such as accountability, two person integrity and dealing with receipt, transfer, or destruction of material, the fact that Cox had previous Air Force COMSEC experience did not put him at a disadvantage to Ransom or anyone else with Naval COMSEC experience.

Summary judgment is appropriate when there is no genuine issue as to any material fact. *See* FED. R. CIV. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of

the nonmoving party. *See id.* Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–12 (4th Cir.1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the evidence presented must always be construed in the light most favorable to the nonmoving party. *See Smith v. Virginia Commonwealth Univ.,* 84 F.3d 672, 675 (4th Cir.1996)(*en banc*).

▇▇▇ Under Title VII, the plaintiff bears the burden of establishing a *prima facie* case of discrimination. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This burden on the plaintiff is not an onerous burden. *See id.* To establish a *prima facie* case of discriminatory failure to promote, a plaintiff must show: 1) he is a member of a protected group; 2) he applied for the position in question; 3) he was qualified for the position; and 4) he was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994); *Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1129 (4th Cir.1995).

▇▇▇ If the plaintiff can establish a *prima facie* case, the burden then shifts to the agency to articulate a legitimate, non-discriminatory reason for the challenged action. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the agency does this, then the presumption of discrimination created by the *prima facie* case "drops from the case," and the plaintiff bears the ultimate burden to prove

that the defendant's proffered reason is pretextual, that is that the proffered reasons are false and discrimination is the real reason for the decision. *See Vaughan v. Metrahealth Companies, Inc.,* 145 F.3d 197, 202 (4th Cir.1998) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The plaintiff cannot prevail on the ultimate issue merely by demonstrating that the defendant's proffered explanation for the adverse action is false. *See Gillins v. Berkeley Elec. Coop., Inc.,* 148 F.3d 413, 417 (4th Cir.1998). The plaintiff must offer evidence that discrimination was the real reason for the action. *Id.*

Turning to the question of whether Ransom has made out a *prima facie* case, the Navy chooses not to contest that elements one, two and three have been met. Turning to element four, whether Ransom was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination, the Navy submits that Ransom has failed to satisfy this element as he has not produced evidence establishing he was more qualified than Cox. Further, the Navy argues that Ransom has not offered any direct evidence of discrimination, such as comments or gestures to support his allegation of racial discrimination. The Navy construes Ransom's argument to be a systemic one: there must be something wrong with the system if an Air Force retiree can be selected over him.

▇▇▇ However, the Navy fails to appreciate the holding of *Carter v. Ball,* 33 F.3d 450 (4th Cir.1994), a case which considered the discriminatory failure to promote *prima facie* test. Concerning the fourth prong, in no uncertain terms the Court said: "To satisfy the fourth prong, Carter need only show that the position was filled by a white applicant..." *Id.* at 458. Once the Plaintiff has shown the position was filled by a white applicant then the Navy must show that the white applicant was more qualified.

■ Next, the Court examines whether the Navy has articulated a legitimate, non-discriminatory reason for the challenged action. The Court is entirely satisfied that the Navy has met their burden, for a number of reasons. The record is uncontested that Cox had held the position of Security Custodian in the years immediately preceding his selection as Security Specialist, and that Ransom had Assistant Custodian experience many years prior to the job being listed. Selecting Cox on this basis, in and of itself, is legitimate and non-discriminatory. Further, the fact that Ransom was not considered by the Subject Matter Experts and Keane after OPM issued its Certificate of Eligibles due to the OPM Rule of Three is further evidence of the lack of discriminatory animus and supports a finding that the Navy's decision was based upon legitimate reasons.

■ As the presumption of discrimination has now dropped from the case, it is up to Ransom to put forth evidence from which a reasonable juror could conclude that the employer's proffered reasons were false and that unlawful discrimination was the real reason for non-selection. Reading Ransom's Complaint broadly, his pretext argument is as follows: 1) that Cox never worked for the Navy and for that reason could not be more qualified than Ransom, who had worked for the Navy for many years; and 2) Ransom retired at a higher grade in the Air Force [3] than Cox.

■ However, the mere assertion that a plaintiff is more qualified than the selectee is insufficient to establish pretext. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that plaintiff cannot rely on conclusory allegations to create factual dispute warranting trial); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action"). There is absolutely no evidence in the record that

Cox' experience with CMS in the Air Force was any less relevant or valuable than Plaintiff's experience in the Navy.

Ransom attempts to rely upon the notarized questionnaire which he had prepared and was filled out by an Air Force COMSEC Manager to show that Air Force COMSEC managers (which Cox once was) cannot adequately identify Navy COMSEC materials. Rather than create a genuine issue of material fact, though, the questionnaire at most shows that the manager who filled it out could not recognize certain Navy acronyms. It says nothing about Cox, and no reasonable juror could find that it does. That one Air Force COMSEC Manager could not recognize certain terms says nothing about whether Ransom was more qualified than Cox. Further, knowledge of Navy acronyms relating to COMSEC is not necessarily indicative of whether a candidate with COMSEC experience in another service can manage COMSEC for the Navy. Indeed, both Commander Babb and Captain Keane testifed that the Army and Air Force do not differ from the Navy on basic COMSEC features such as accountability, two person integrity, and dealing with receipt, transfer, or destruction of material.

That Ransom retired from the Air Force at a higher grade than Cox is not significantly probative of whether he is more qualified than Cox for the position at issue. Regarding the Rule of Three, Ransom produces nothing to refute the Navy's explanation of its use here. Ransom's view of his qualifications is simply irrelevant unless he can show that the Navy's position on his qualifications is a pretext for discrimination. *See Riley v. Technical & Management Servs. Corp., Inc.*, 872 F.Supp. 1454, 1461 (D.Md.1995), *aff'd*, 79 F.3d 1141 (4th Cir.1996). Even if Ransom was in fact more qualified, this fact alone does not establish that the Navy's reasons for choosing Cox were pretext. *See Williams v. Encompass*, 969 F.Supp. 15, 17 (E.D.N.C.1997). Ransom has not of-

---

**3.** Ransom served in the Air Force prior to his civilian employment with the Navy.

fered any direct or indirect evidence that the selecting official, the panel members, or anyone else involved in the selection was motivated by a discriminatory animus. To allow a party to defeat a motion for summary judgment by offering purely assumptive allegations of discrimination, without concrete evidence to support the allegations, would necessitate trial in all Title VII cases, and this is not the result intended. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). That is why summary judgment on the discriminatory failure to promote claim must be granted in favor of the Navy.

■ The Court is employing a liberal pleading standard in concluding that Ransom's *pro se* Complaint sets out a claim for retaliation in violation of Title VII. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). In order to prove a *prima facie* case of retaliation, a plaintiff must prove that: 1) he engaged in protected activity; 2) that the employer took an adverse personnel action against him; and 3) that a causal connection existed between the protected activity and the adverse action. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989) (citing *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)).

■ The Court will concern itself with prong three of this test, as the Navy concedes that Ransom engaged in protected activity and that the Navy took an adverse personnel action against him when it refused to hire him for the Security Specialist position. From the evidence before the Court, for the following reasons, summary judgment is appropriate in favor of the Navy on this count as well.

There is absolutely no evidence of a causal connection between the allegations raised in Ransom's earlier EEO Complaints and his non-selection for this position. While Keane, the selecting official for this position, testified that he was informed that Ransom had filed at least one earlier EEO Complaint prior to the beginning of Keane's command, Keane was not involved in the previous Complaints in any capacity. He had no reason to be concerned with Ransom's previous allegations or no basis to retaliate against Ransom. Further, because Ransom was not within the top three individuals on the Certificate of Eligibility, Keane never considered him for the position due to the OPM Rule of Three. Likewise, there is no evidence that Plaintiff's ranking as number four on the list was affected in any way by his previous Complaints. In short, Ransom has no evidence to contradict the Navy's reasoning for its decision, and has offered no evidence to support his claims of retaliation.

An appropriate Order shall issue.

### *ORDER*

This matter comes before the Court on Defendant's Motion for Summary Judgment. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED, and that this case is DISMISSED.